Good morning, Your Honor. And as you've noted, this is a collective argument. We were hoping to reserve about five minutes in rebuttal, so we'll try to be mindful of that. My name is Carolyn Phillips. I'm counsel for Edison Shino. I'm going to be arguing prosecutorial misconduct as it appeared in this trial regarding inflaming the passions of the prejudice of the jury, disparagement of defense counsel, and impermissible vouching. Ms. Luban will be addressing the ethnic generalizations and stereotyping. It's our position that the instances of prosecutorial misconduct were sufficient enough to require the jury to bypass the deliberative process and to determine guilt on the basis of emotion. The first instance occurred when the prosecution stated, and I'm quoting, guns and drugs go hand in hand, and the agents had — if the agents had not been there, this would have been another drug rip, and who knows what would have happened to that little boy that was coming out of the McDonald's. Now, there was an objection raised there, and I think it should be noted that the location for this transaction was actually chosen by the government agents, even when the appellants had urged the agents to move the transaction to another less populated site. Had the jury heard the transcript of the transaction, including the instructions from the agents for the little boy to get out of the way? Yes, I believe so. Okay. So the jury knew that a little boy was present in the vicinity when the agents had swarmed the defendants. I believe that's correct. I think what is occurring here, obviously, is that the prosecution is focusing on something apart and separate from what are the facts that are needed here, what are the facts that are needed to establish each of the elements of the charges against these individuals, for the jury to weigh those facts only, not to impassion the jury to reach a conclusion not based on the facts. Whether the boy was there or not really did not have anything to do with whether or not these individuals were going to be guilty of their charges. Well, that works both ways. Whether the boy was there had nothing to do with whether these individuals were guilty. So what difference can you see that it made on the jury's deliberation? And, again, I think we have to look at the fact that the government was in charge of setting up the location of this transaction to begin with. And now then to turn it around and say, well, the transaction was occurring in a place where there were children present, it was the government who had actually chosen the location to begin with. And now they're wanting to use that. And that doesn't have anything to do with the guilt or innocence of the defendants either. That's right. In fact, this should not have come up at all. Because what happens later on in the closing argument is that the prosecution then continues with this theme. And I have a fairly long quote here from her. But this is what she says. These drug traffickers, and she's referring to the appellants, pose a real and viable threat had it not been for the intervention of these law enforcement officers, it was a volatile situation. There is a real danger. The city of Turlock should be thankful to law enforcement for their efforts in defusing a volatile situation, for finding these drug traffickers, and you, ladies and gentlemen, should not let the city of Turlock down. Did you object? Okay. Ms. Phillips, this is Judge Gould. I have a question for you. What evidence is there that's in dispute as to any element of the crimes for which Mr. Sheno was convicted? In other words, what issue is in dispute on the evidence that where these allegedly inflammatory statements would make a difference? Well, I think, first of all, these statements are diverting the jury's attention from the evidence. But please try to answer my question. Okay. What evidence is in dispute by any element that Mr. Sheno had to be convicted of? Okay. First of all, Mr. Sheno was a peripheral character. He was friends with these individuals that were the target of this investigation. He provided some money on deals or on buying drugs, but what evidence is in dispute about what he's alleged to have done at the periphery? Well, for instance, what I was going to say is that Mr. Sheno, he's a friend of the individuals that were the target of this investigation. He shows up – I mean, really the only time that he shows up in the vicinity of drugs and the agents is at McDonald's. He is a person that comes with another individual who is another appellant here, Mr. Zazueta, and he's driving the car. He comes with a bag of money and hands it to Mr. George, and that is – that's it. That's all he has to do with this. So the dispute is whether or not there's sufficient evidence to find that there's sufficient evidence to attach and find that Mr. Sheno is actually an active participant, a knowing participant in this conspiracy. Okay. So you're saying even though he hands the money to Mr. George, that there's a dispute whether he's a participant? Well, I think part of the issue here is this is circumstantial. There was never any evidence that Mr. Sheno knew what was taking place. There's no evidence that he – How much money did he give Mr. George? $15,000. Okay. So he's obviously not giving him money to buy a sandwich at McDonald's. And was there any other evidence? We don't know what Mr. Sheno's understanding is in terms of why he's brought this money to this location. There's no evidence. You didn't have to testify, but did anyone present any evidence showing a different reason for the money than a drug deal? I believe that there was evidence regarding the money that was removed from the bank by Mr. George and regarding removing money from the ATM in order to give to his mother for a trip. And I think there was $5,000 on Mr. Sheno's person at the location, which my understanding is there was a neutral explanation for that money as well. But I think what is critical here, and my understanding is that the reason why prosecutorial misconduct in terms of inflaming the jury is so critical is the danger of diverting the jury away from what the real facts are and having the jury, instead of looking at the elements of the case, be convinced by the government's appeal to their motion to urge them to deliberate not on the facts, but on the responsibility to the city of Turlock, which is clearly what she's done here. Let's suppose that we thought that the reference to Turlock and the reference to the little boy at McDonald's were irrelevant. And because they were irrelevant, improper. These were fairly fleeting references in a very, very long trial. Well, part of the basis of the appellant's claim here, and I think there were many objections that were raised throughout the trial, I've just pulled out a few to talk about today, but the misconduct was fairly pervasive in terms of bringing up and misstating the evidence, bringing in and cross-examining Mr. George regarding information, very inflammatory information, without foundation about Mr. Sheena's connection with some drug dealers that there was no factual basis for and it was never submitted. So this isn't just one or two occurrences. These, I think, are the highlighted prosecutorial misconduct in terms of the closing. I have to say, I see a lot of transcripts and trials, and my impression from the transcripts that I have read in my years on the bench is that by the time you get to closing argument that rhetoric is running pretty high and that these kinds of rhetorical flourishes are, again, I think irrelevant and probably should not have been uttered by the prosecutor, but in terms of the value of the rhetoric, it doesn't seem to me much outside what we typically see. Well, I think in terms of the focus of the Court's decisions have been whether or not the government is trying to divert, again, the jury's attention away from the facts. I'm actually over my time for this portion. Thank you. May it please the Court. I'm Suzanne Luban. I represent Mr. Nobari. And I just want to say that all of the arguments that are raised in our briefs under the category of prosecutorial misconduct, those discussed here and also just in the briefs that weren't able to be discussed here today, the effect of those is cumulative with the part that I'm now going to talk about, which is the ethnic characterizations and generalizations that were done in both. And I really want to jump right to the same question, because let's accept for a moment that the characterizations were improper. We'll accept for the moment that some of the arguments that were related before, the city of Turlock, let's assume all of that is misconduct or improper. And we have to ask ourselves, what difference does it make in a context where the identity that, I mean, you're concerned about that particularly in a case where the jury wants to convict somebody, and so they find somebody. But the identity of the defendants isn't an issue here. These guys have been picked up at the scene. So what difference does it make? So what you're asking is, what's the prejudice? And so in this case, the only defendant who was actually part and parcel of the negotiations was Defendant George, Eddie George, and he had an entrapment defense. So the jury could have believed, if they were not so prejudiced, they could have believed his entrapment defense. Well, your client, Mr. Nobari, is involved in all the conversations at the McDonald's before they leave and then come back. So there's a deal set up. The time is set. The amount is set. There's a long history to it. My client's never involved. He's never mentioned. No one ever knows anything about him. He's not one of the people that they've been tracking in this big methamphetamine investigation. He's there at the scene. He's my client's best friend. They are referred to each other as cousins, apparently, at some point, or somebody thinks they're cousins. They're together a lot. Sheena was also a friend of theirs. The conversation doesn't make him appear to be an innocent bystander. He's not just there because somebody wanted to make a stop on the way to Eddie's house. He is a knowing bystander, and that was his defense at trial. What's a knowing bystander? Knowing presence. Mere knowing presence is insufficient to find somebody participating. But you mean by knowing presence you mean he's present but he doesn't know anything about it? No, no. I'm sorry. He is aware. It's clear that he's aware of what's going on. But he's not looking at the pills in the truck when they bring the truck to show the pills. He's hanging out. He's talking on the phone. I'm looking at page 3. This is at whatever it is, 428. Okay, but so you want us to go get the money. That doesn't sound like somebody who's just standing around waiting for a transaction to finish up so he can go about his business. There's a gun in the car, but he doesn't bring the gun with him. If he's supposed to be present and participating in the transaction, why doesn't he have the gun on his person? There's a defense. He's busy talking. We've got to get over the what do we call it, hump, and hump comes back like a half dozen times for the next few minutes. Nothing in his discussion suggests that he's outside the transaction. I would like to talk about the cases because in all the other cases where the ethnic generalizations were actually less egregious than in this case, there are numerous situations, including Cabrera, where the evidence is actually even worse than the evidence that was in this case. In Cabrera, there are three hand-to-hand recorded transactions with these round, flat wafers that the agent testifies that are typical among the Cuban community. And in that case, therefore, the fact of the wafers was a topic that would have been possibly proper for expert testimony had the agent not gone on and on about it. And so in the Doe case, I think that's a D.C. case, a circuit case, one of the two cases, where the Jamaicans are taking over the drug trade in D.C., I think it is. And the Cruz case, second circuit case, where the testimony is that the Hispanics come down. They bring people into New York City from outside, including Dominicans. And this guy was called the Dominican. Like in our case, the person is called Mr. Zazueta is called, or they attribute somebody in the drug case to being called the Mexican. The government argues that's the defendant. In each of those cases, the people are arrested in apartments with lots of drugs, or they are hand-to-hand transactions, or the other defendant in the Cabrera case, the cop says, take me to your source, and he takes them to the apartment, and that's the other defendant. So in each of those cases, the testimony, the evidence against the defendants is arguably significantly worse. But ‑‑ But what's the rule to be drawn from the cases? Is prejudice not an element of ‑‑ It is a smaller element in these ethnic characterization cases, because racial generalization is such a serious problem. It's viewed as such a terrible impact on the integrity of the criminal justice, of the criminal trial. In Cabrera, this court said ‑‑ Ms. Pavan. I'm sorry. My question is this. You know, I realize it can be a major problem, and especially if there's an element in dispute, like identity or any other element,  but if there's no issue on the evidence about someone's participation in an illegal conspiracy, then wouldn't any error, any due process error, be harmless beyond a reasonable doubt? In this case, these ‑‑ I'm sorry, Your Honor. I don't see how we can just compare the facts in, like, our case with any other case and say the evidence is worse. It seems to me that the question, at least for me, is, under Cabrera, is it a structural error or do we test for harmless error? And I realize that was a plain error case, but here there was objection. So, like, is it harmless error or not is an issue we see in scats of cases, you know, dozens of cases. So what would be different here in a harmless error analysis than in the normal case? Well, I think that the ‑‑ in Cabrera it was a plain error case, but the defendants won in that case. So clearly this court has analyzed this type of prosecutorial misconduct where there's ethnic and racial generalizations with a more stringent approach, and there needs to be less shown. So they didn't say it was structural error. No. Right? They don't say it's structural error. They said it's a plain error. And in some ways a plain error test is less stringent than harmless error, and in other ways it's more stringent. But still, don't we have to look at the facts of our case to apply the Chapman standard? Yes, but the defendants here did. The three defendants, aside from George, their defense was that they lacked intent. They were present. They possibly knew about it, but they either did not facilitate or they lacked intent to participate in the crime. And in each of the cases that I've been discussing here, the defendants also asserted that type of defense, and yet there was very significant evidence against them. But this undermines the integrity of the trial. And by the way, the judge gave a limiting instruction that purported to limit but actually told the jurors that it was all right for them to consider that generalization in the context of these defendants. Just don't consider it in the general society. So when the judge said – when the investigator said based on his other investigations, it's clear under all of these cases that the conduct of people in other racial groups is not relevant to the conduct of these defendants. Agent Jones testified that in his experience that the drugs were coming in from Canada to New York and Chicago, and that frequently in those transactions that there were persons of Middle Eastern background that were the brokers. They typically did not process the pseudoephedrine. Usually that was processed by others, including Mexicans. Was that testimony improper? Bringing in was probably – you know, their ethic – Did you object? I wasn't there, but – Did anyone object? The objection was made the next morning, and I have argued in my brief that that was sufficient. Government says it's not sufficient. It had to be, you know, plain air standard. The next morning after the two – not only the agent testified, the informant testified earlier and went through this very scripted direct where she said, so what role do the Mexicans play in the methamphetamine business, and do you ever see a Middle Easterner cooking? Let me go back. I realize there was a very, very general objection on the basis of foundation the following morning, and nobody objected to Jones' testimony, okay? So let me give you an opportunity now to tell me whether you would object. Is Jones' testimony improper? Yes. When Jones says that – That in my experience – The pseudoephedrine would be given to a Mexican cook, and it would be converted to other chemicals, and then when he says – he asks, what does the role of Middle Easterners play? In the cases I have been involved in, Middle Easterners were secreting the pseudoephedrine, blah, blah, blah, and bringing it – yes, absolutely that was objectionable. Why was it objectionable? Because the fact that people in other investigations – this guy was a cop in Chicago. In other investigations, there were people of various races or ethnic groups doing different things is irrelevant to what these individuals were doing. Nobody said – there was no expert testimony to say that these individuals, when they were referring to each other as Middle Easterners, that what they were doing was really saying, I'm a middle man, are you a middle man? I mean, the government's never said that that's been the case. That was objectionable just in the same way that in Cruz, that they say various Hispanics come into New York, including Dominicans, and bring buyers. And this was a Hispanic neighborhood. This is exactly the same thing. It's the same thing as in the Korean businessman case, the Jinro, and in the Byrd versus Glacier, Your Honor's decision, Judge Gould, where people are generalized based on the conduct of other people of their same ethnic group in prior times. It's completely improper. It's unconstitutional. I want to just take a couple of minutes and talk about the gun issue. If you don't mind, this pertains to Mr. Nobari and Mr. Zazueta. Now, it's – in Your Honor's decision, Judge Bybee, the man decision, you hold that the standard of participation of in furtherance is a greater standard than during and in relation to, and throughout these jury instructions, the district judge told the jury that they could find these all four defendants guilty of possessing a gun during and in relation to a drug felony. That is not a crime. There's a substantial – these instructions led the jury and created a substantial risk that they were found guilty of a crime that does not exist. And by a standard that is a lower standard of participation than the standard that the government had to prove. Now, the jury acquitted two defendants of the gun charge. And so the only two defendants that were convicted were Mr. Nobari and Mr. Zazueta. And in this situation, there's no way to tell which instruction the jury followed. The judge gave a couple of different versions but never said which one is the right one. He never said, oh, those other things I said were wrong. It's not really during and in relation to. It's really in furtherance. And in furtherance means blah, blah, blah. And so, in fact, when the judge was giving the description of the substantive offense, so count three, when he got to the third element, which is the important element, the element that we're talking about here, the standard of participation, that's when he used the term during and in relation to. So – Okay. Here we're definitely on a plein air standard, right? Yes. So we need to look to the particulars of the situation. Starting with Mr. Zazueta, could it possibly have made any difference? Well, Your Honor, under Gowden, I think that's how you say it, if the jury is an instructor on an element of the offense, that's structural error. So if there's – or actually, maybe it's – Were they instructed or were they over and confusingly instructed? Is there any chance the jury could have convicted them of the offense that's not an offense? And clearly, there isn't such a chance because that's how they were instructed. If they don't know what the standard is, then the government had a lower standard it had to prove. And so you can't examine whether or not they did prove it or could have. So I take your argument to be a legal one that it doesn't matter what the particular facts in the case were. And in Mr. Zazueta's case, I think you're probably stuck with that because the facts are pretty inculpatory. I believe Mr. Zazueta's attorney would argue that there was no evidence that he facilitated the offense with his gun and that that's an element of this offense. And clearly, I will argue that as to Mr. Nobari because the car – the gun was in the car, far away and not near any of the people, and the drugs weren't there when the gun was there. And so the drugs were never there when the gun was there, so there never could have been a ripoff. It was a completely illogical argument that the prosecutor made in that regard. So I think I'm going to sit down now. Roberts. Now, are we hearing from somebody else now?  Okay. For Nuttall. May it please the Court, counsel for the government, my esteemed colleagues. My name is Roger Nuttall. I'm an attorney that represented Eddie George in the trial of this matter. Indeed, I'm going to try to leave some time for rebuttal, but I'd like to cover just a couple of points briefly. Indeed, in the case of Eddie George, there was a very significant factual issue dealing with entrapment based upon the conduct of the government agent as being essentially beyond the pale in this case. As such, the combination of ethnic characterization and prosecutorial misconduct directly prejudiced Mr. George in terms of his assertion of that entrapment claim. We also raised the issue of the failure or the fact, I can't call it a failure because we did not have the Southwell case in our reach at the time of this trial. But there were two elements. The two elements of entrapment are government inducement of the crime and an absence of predisposition on the part of the defendant. There was a good deal of evidence on both of those elements. And the problem without giving the unanimity instruction is that the instructions that were given failed to explain that a finding of not guilty by reason of entrapment would supersede the finding of guilt that we acknowledged. And as such, this instruction that was given was ambiguous. Now, the government suggests that the simple advisement of the jury and the jury instructions that the jury was required to reach unanimous agreement on the issues is simply not enough because in the final analysis, whether the jury was unanimous in finding that Mr. George met these two prongs really is entrapment is unknown since no instruction was given specifically instructing the members of the jury that they must unanimously reject the affirmative defense prior to finding them guilty of the underlying offenses. Now, I realize this. Was such an instruction requested? Pardon me? Was such an instruction requested? No, it wasn't. So apparently it didn't seem to the people present at the time that a separate instruction was necessary to avoid misleading the jury. Well, again, had we had the Southwell, the benefit of the Southwell. The Southwell doesn't say, does it? Does the Southwell instruct the courts to give separate unanimity instructions with regard to affirmative defenses? I don't think it sets forth such a program. Well, we believe that it sets forth the concept that the jury needs to be advised that they have to unanimously reject the asserted affirmative defense, unanimously reject the asserted affirmative defense before they can abide by their finding of guilty. If half this jury had thought that he was entrapped, we would have had a hung jury. I don't think that's necessarily true, because, here again, we don't know that, because all we know is that the jury found Mr. George guilty beyond a reasonable doubt on the charged offenses. But what we don't know is that the jury did not have a question as to, did not, even though they may have been unanimous in finding that the prosecution had not proved that he was not entrapped beyond a reasonable doubt, we don't know that, and we don't know that the jury knew that that would override the underlying conviction. I'm only going to say one more thing, as submitted on the sentencing, clearly Mr. George should have been allowed to avail himself of the safety valve under 3553 and under the sentencing guidelines, found not guilty of having the gun, he was not in a leadership role, and we view that as having not allowed the court. The court, therefore, was forced to hand down a sentence which was grossly unfair under 3553. Thank you. Thank you. I think we've heard for the moment from the defense, so we'll hear from the government. Good morning, Your Honors. I'm Karen Escobar. I represent the government in this consolidated appeal, and I did handle the trial of this case. I intend to focus on three areas. That's the alleged prosecutorial misconduct, alleged insufficiency of the jury instructions that have been complained of, and the alleged insufficiency of the evidence to support the 924C convictions. Certainly the most serious and eye-catching of these allegations is the defense claim of prosecutorial misconduct. The government did address that claim extensively in a very detailed fact-based analysis in its brief. As the record reveals, there was no prosecutorial misconduct. Evidence relating to George's own ethnic-based references in the recordings of the deals, and Zazueta's and Shino's connection to drug traffickers was relevant and probative, and therefore properly admissible. There was at no time by the government any deliberate injection of ethnicity at trial. Well, let me stop you, because I have to say I've got some grave concerns about the examination. It began with the informant, but it got to be very detailed in chapter and verse with the agent. And for the life of me, I can't figure out what some of those questions had to do with what I think are the legitimate factual disputes or issues in the case, so maybe you can take me through and tell me what the point of this was. Well, let me first say that both Agent Jones, a DEA agent who was based out of Chicago, and the informant were not called by the government. They were called by the defense, Eddie George, in support of his alleged entrapment defense. I submit if the district court had granted the government's pretrial motion to exclude evidence of entrapment, we would not be here today. There was no evidence ever of entrapment. I hear that, but these witnesses did testify, and you apparently personally asked some of these questions. Yes. So what was the point? The point was, first, with respect to Agent Jones, who testified after the informant, those by the government during cross-examination, Mr. George submitted or admitted into evidence these recordings of Eddie George and Zia, the informant, that dealt with the failed Chicago transaction that was not part of the government's case. Those recordings, they were at tab nine, I believe, of the government supplemental excerpts of record, contained numerous pejorative references to Mexicans, to Middle Easterners by Eddie George, and the comments were made within the context of coded language. Eddie George was talking about doubles, talking about moving it, but there was no clarification of what it was. The government felt entitled to clarify the substance of those recordings introduced by Eddie George, and that's why the references to ethnicity needed to be clarified within the context of the code. I've got to say, I don't understand why it's important to establish that Middle Easterners act as brokers in transport. They don't cook sheds any light whatsoever on the transcripts or on the recordings. I mean, that doesn't identify what it is, unless you're trying to persuade the jury that, well, it must be illegal drugs because that's what Middle Easterners deal in. Is that what's probative about this? I think it was appropriate for the agent to testify, based on his training and experience, about the roles of Middle Easterners in Chicago. Why? To explain when Eddie George was referring to the effing Mexicans, what that meant, and based on the training and experience of the agent, it meant Mexicans in California who would receive, would buy the pseudoephedrine and convert it into methamphetamine. So why did the jury have to know that? First, to counter the entrapment claim. It established that George was predisposed. He was not a novice. Because he's a Middle Easterner? That's proof that he's predisposed? To explain the meaning of the conversation, of the negotiation, when he's referring to the effing Mexicans want this. But I think the jurors understood what the effing Mexicans were as a reference to an ethnic group. I don't think we can assume that the layperson could understand the meaning of the recording conversation. It is very, it was cryptic. See, if you're trying to make the connection, the reason he's referring to Mexicans is because that's who the buyers are. I think you've got an identical problem, because you're trying to suggest that, well, we're just going to use this ethnic generalization. And the fact that he's using a generalization Mexican, he must be referring to people buying illegal drugs, because everybody knows Mexicans don't do anything else. So that's what the reference must be to. The fact of the matter is that George's ethnic-based references were in his own recorded statement. So what? Why did the jury need this explanation of what he said? What does it prove? Well, the jury is entitled to, and the government is entitled to explain. Suppose he used the N-word. Would you be allowed to dump statistics in that show that the crime rate among a certain ethnic group is higher than a crime rate among another ethnic group, or that people of a given ethnic group commit more robberies than somebody else? That's not what the testimony was, that all Mexicans do. It sure sounds like it. You're eliciting testimony that says what Middle Easterners do is transport drugs and what Mexicans do is cook it. How is that probative? Within the context of methamphetamine drug trafficking organizations was the testimony of the agent and also of the informant. It was not a generalization that Mexicans always are the buyers of pseudoephedrine pills or that always Middle Easterners are the brokers of pseudoephedrine, which was picked up later by the defense in the closing argument. Mr. Nuttall himself indicated that is exactly what the testimony established, that all Mexicans do this, that all Middle Easterners do this. No, the testimony related strictly to the role of those groups within pseudoephedrine pill trafficking organizations. In any event, the government submits that the testimony of agent and informant, agent Jones and the informant during cross-examination was elicited, also was invited, was invited testimony elicited in response to George's and Sosuete's attorneys' questioning of them, questioning specifically about the recorded conversations by Eddie George that referred to those ethnic groups. What questions invited the questions that you posed? Your Honor, there were no questions. The fact that they make reference to ethnic groups doesn't explain to me, so far at least, why you needed to ask the questions you did or how they were doing anything other than introducing potential ethnic bias into the proceedings. Again, Your Honor, it was to explain the nature of pseudoephedrine pill trafficking organizations within the context of the calls introduced or the recordings introduced by George and to give the jury explanation of the meaning of those calls. In any event, there was discussion, too, regarding the timing of the objections the government submits that the timing was not contemporaneous. It was the next day. Mr. Nuttall objected. After Zia testified, after Agent George testified during cross-examination, I think there was redirect. Many pages later in the transcript the next day, there was the objection. I submit that it was not timely. So review is for plain error. And even if it was not. That might bring us to the Cabrera standard, which was another plain error case. And we heard some discussion during the defense presentation about what Cabrera says to this case. What's your take on that precedent? I think Cabrera is distinguishable because it did not deal, as here, with ethnic-based references in recorded statements of the defendant. It dealt with generalizations across the board, sort of generalizations that I agree are improper. Again, the case did not involve recorded statements of a defendant who made ethnic-based slurs, pejorative comments. And such evidence has been upheld in the Supreme Court case, Wisconsin v. Mitchell, which upheld the admission of recorded statements of a defendant whose words revealed a bias. Ms. Escobar, Judge Gould, I have a question for you. Yes, Your Honor. Assuming, and I haven't reached a conclusion on this, but if we were to conclude that, oh, there's no intentional effort to bias the jury, that the questioning went too far in some ways and was a due process violation. Assume that we conclude that. What would be the government's argument, the best argument that you could make, any violation was harmless beyond a reasonable doubt under the Chapman standard in light of the issues regarding Mr. Novari, Mr. George, Mr. Shino, and Mr. Zazu, I think? Your Honor, any error was harmless. There was no prejudice to the defendants because the government presented overwhelming evidence of each of the defendants' guilt. The, as Your Honors have indicated, all of the defendants showed up at this drug deal were active participants. Zazueta was armed with a laser-equipped loaded Beretta whose only purpose is to kill human beings. Novari possessed his firearm that was immediately accessible to him. It was under the passenger seat where he was sitting at the time the agent was receiving the money. It was actually $20,000, not $15,000 that was paid, that was provided by Shino and Zazueta when they arrived at the drug deal, given to George, and then in the car the agent was sitting at the passenger seat. Underneath the passenger seat was Novari's firearm, which an agent testified earlier when George and Novari went to meet with the money man. One of the agents testified on surveillance that he saw Novari reach down to the floorboard of the passenger area, lift up his shirt, put something in the waistband of his shirt, consistent with arming himself before he went into the residence that was Shino's residence where they met with Shino and Zazueta to get financing for this drug deal. Again, the quantity of drugs negotiated for in a very skillful manner by Eddie George was for an extremely large quantity of pills. It was 20 buckets, which filled a truckload, a truck that Galvan's associate, Agent Galvan, brought someone, he indicated was an associate, to flash the pills, to show the pills. Eddie George goes into the back of that truck, the Enterprise rental truck with the buckets of the pills, and Novari is standing right outside. There was a videotape introduced at trial, and you see him peering in as well. Novari also talks about how this is our effing town, referring to the town of Turlock. He also talks about how this is the capital for it, referring to that radius. He said something like a 10-mile radius where they were in the town of Turlock, which at the time was very true. The Central Valley was the methamphetamine capital of the world at the time of this case. It's coming back to that again. In any event, the evidence was very, very strong with respect to all, so I submit that there was no prejudice in the questions and testimony elicited on cross-examination of the informant and DEA special agent. In what was a very hotly contested, very emotional trial, and accusations were flying all over about how the government had profiled the defendants, specifically Zazueta. His attorney, from the outset of the trial, talked about the government was, this wasn't even the Mexican that was guilty. How can we know that Zazueta was the one involved? But there were arguments throughout the trial regarding racial profiling and bias. And it's very clear also, it was picked up in closing argument by the defense attorneys, and the only other objectionable comments by the government were in the closing argument, the final closing argument. If you look at the opening close of the government, it was a very dry legal analysis of the evidence. There was no evidence in support of each of the elements of the crime. It was only in final close that the little boy comments and these other challenged comments were made, and those comments were made in response to largely unfounded statements by the defense, and very inflammatory statements by the defense in their closing argument. So I submitted, those statements were invited. But at any event, Your Honor, the evidence was very overwhelming as to each defendant. So there was no prejudice to them. The ---- Well, it's just, I mean, maybe we should go through them individually, because there's no doubt but that they were present at the scene and try as they might. It is hard to come up with an innocent explanation. So as far as that goes, I hear your argument. Let's start with Mr. George, who took an entirely different route. I mean, he was caught red-handed, so he tries an entrapment defense, which requires us to go to his predisposition, what would have happened otherwise. And I think the concern is that the argument that Middle Easterners are middlemen and they're brokers and they're the ones that move the pills out to the West Coast could be perceived by the defense as a threat. And the jurors, as a way to say, well, that's what he does, he's Middle Eastern, he must be in on it. Don't you perceive a potential risk there of the jury being influenced by the ethnic references? Again, Your Honor, that evidence was not emphasized strongly in the government's cross-examination of Ziad or the agent. The cross-examination did not ---- There were a total of just several pages of transcript where the agent, based on training and experience, referred to role occupied by certain ethnic groups within methamphetamine trafficking organizations. Again ---- Well, there's a question. This is to Agent Jones. Question. And based on your training and experience, what is the role that Middle Easterners play? Answer. The cases I've been involved in, the Middle Easterners were secreting the pseudo-phetamine from Canada into the United States, with the final destination being California. Question. And typically, what is the role that they are involved directly in the manufacturing process, the Middle Easterners? Answer. Based on my experience, the Middle Easterners are simply controlling the set of federine trade and as a middleman and getting the pills to a cook. So, okay, they're not cooks. They're transporters. They're the brokers. It was clearly before the jury that three of the defendants fit that description of being Middle Easterners. And with regard to those defendants, can we be confident that the jury wasn't influenced in believing, okay, they must have had a ---- Mr. George must have had a predisposition. The others must have had the intent, because that's what those kind of people do. Well, isn't that enough? That's the point. That is that we believe that certain ethnic groups do certain bad things. And if you make that impression strong enough, you know, let's see, I hope we'll find a group that nobody's in the room. The Ukrainians, I don't know if we have any Ukrainians here, but Ukrainians, you know, they can't be trusted. They're always forging documents, and that's what Ukrainians do. So you've got a forgery trial against a Ukrainian. Doesn't that kind of poison the well? No, Your Honor, because the reference was not made in a vacuum. It was made after extensive discussion, well, incredible smearing of the informant. The informant himself, when he was testifying, referred to himself and his associates as Middle Easterners, and this is what they do. And he was attempting to explain also what the nature of the recordings introduced by George was. There was extreme focus on the informant during George's ---- when George called him as a witness for the entrapment defense. And I think that it was permissible in the context of the trial for the agent to explain what was meant. And that is our position. There was no harping upon it. It was in response to very terrible attacks on the informant. The informant referred to his Middle Eastern associates who were convicted with him, too, in Arizona when the defense was asking about, you know, other ---- the conviction out of Arizona. And within that context of attempting to impeach the Ziad, the agent's training experience, I think, in pseudo-federal pill trafficking, it was permissible for him to explain role, even though ethnic-based, within that context of pseudo-federal pill, not in a vacuum, and also to explain those recorded recordings. I think with the district court's extensive instructions to the jury regarding burden of proof and the definition of evidence, that, too, was a very strong evidence of the defendant's guilt, and so any error was harmless. I submit that this consolidated appeal really exemplifies the classic legal tactic that when the facts are against you, you argue the law. When the law is against you, you argue the facts. When both are against you, you attack the other side. And so I think that the claims of prosecutorial misconduct had significant merit. I do not believe that they do. Long ago, Judge Learned Hand referred to the general conspiracy statute as the darling of the modern prosecutor's nursery. The government submits that the claims of prosecutorial misconduct is the darling of the modern defense attorney's nursery. Certainly ---- We all play the hands that were dealt. And sometimes I hear arguments that don't have any legs, but I don't fault the attorney, because that's all you got to work with. In this case, I hear what you say, but I also see some questions that I still have trouble understanding. And to move to the other subject, I hear references to the little boy coming out of McDonald's and the duty to the city of Turlock that, in my opinion, is a little over the top. I mean, it's not unusual to see some things that are a little over the top and look peculiar, put on the printed page years later. But they are references that could stand some explanation and could fairly be questioned, so that I'm not sure that I'm prepared to say, this is just the same old, same old try to attempt to disperse the prosecutor. I mean, let's speak blunt about it. You said some things that, from the perspective of the appellate bench years later looking at the page, kind of scratched my head a little bit trying to figure out what the boy coming out of McDonald's really had to do with anything. Yes, well, again, and it was rhetorical, and it was in the final close after very impassioned and denigrating statements were made by the defense referring to the informant as a rat, talking about the government's failure to comply with the oath. The little boy comments, although objected to, were the little boy was on the recording. There was no prejudice. That recording was in evidence. It was clear that there was a little boy emerging from the McDonald's. Agent Galvan expressed concern for him. Mr. Nuttall said that the government lacked any genuine concern for people. I think that was an appropriate response in an impassioned trial. The Turlock comment, there was no objection to the Turlock comment, and again, it was in response to Mr. Reyes, who represented the city of Turlock. I do think in that situation it was appropriate for the government to say, do not let the city of Turlock down. I would like to turn briefly, if I may, Your Honor, to the jury instructions, the sufficiency of the Section 924C, the Pinkerton, and the entrapment instructions. It's our position that the challenges to those instructions were waived absent plain error, because there was no objection to the instructions. All party agreed on those instructions. George specifically approved the entrapment instruction, and no party objected to the sufficiency of the Section 924C or Pinkerton instructions. The government submits that there was not only sufficient, but overwhelming evidence for the jury to convict Nobari and Sesweta of violating Section 924C beyond a reasonable doubt, so any error in the 924C and Pinkerton instructions was not so prejudicial as to warrant reversal. The evidence was clear that Nobari and Sesweta did not merely possess the firearms, as in Mann, which Your Honor authored, possession of a firearm is in furtherance of a drug trafficking offense. Why don't you focus on Nobari for just a minute? Yes. Because Sesweta's got it in his waistband, it falls out when the agents grab him. Mr. Nobari, the gun's registered to him? It's registered. It's found in the car? At the end, but again, there was the testimony observing going in. Right, but we don't know that it was a gun that he put in his pants. We suspect that it was, just because we know what people do sometimes. Right. But nobody actually saw the gun on that occasion. I think reasonable inference could be drawn, coupled with Agent Galvan, who had at the time had over 23 years of experience, his defense is that this is supposed to be a ripoff at the end, and it does seem odd that they've shown up to buy 13, 15, I forget the number of buckets, with a tiny fraction of the amount of money needed for that. So, yeah, there are reasons to think it's a ripoff, but that's when you would expect he's going to have the gun with him, and not in the car some distance away. The car was not some distance away. George was in the car, and in the passenger seat, Agent Galvan entered, Nobari exited. Nobari was standing outside when George handed the money to the agent who was sitting on the passenger seat where the gun was found. Wait, I'm sorry, who was sitting on the passenger seat? Agent Galvan. I thought Galvan was behind the drivers. At the time, I'm trying to think about that. You know, I recall that he was in the passenger seat. I could be wrong, but the gun was within reach of George. Where was Nobari? He was standing outside with a Mexican. So the gun was accessible. It's totally unlike the Mann case, where the gun was in a toolbox or a safe in a truck, and the key was in the meth lab in a propane tank in a sleeping tent. With respect to the... U.S. v. Combs, which was a Sixth Circuit case cited in Nobari's opening brief and in the reply brief, that does not require reversal here. In Combs, the indictment improperly charged in one count the possession of a firearm during and in relation to a drug trafficking crime, and so fell to a state in offense. The court's instructions on this count track the language of the indictment. The indictment also contained a second 924C count, which properly charged a violation of possession of a firearm in furtherance of a drug trafficking crime. However, the court then instructed on the use of a firearm during and in relation to a drug trafficking offense, and the verdict form reflected convictions on both counts for the use offense as opposed to the charge possession offense. Now, in our case, the indictment properly charged possession of firearms in furtherance of drug trafficking crimes. The judge did mix up some of the language in the jury instructions, but he did not mix it up when he was explaining the verdict forms, which correctly set forth that Count 3 pertained to the possession of firearms in furtherance of a drug trafficking offense, and the verdict form itself tracked the language of the indictment that on or about November 20, 2003, the defendant did possess a firearm in furtherance of drug trafficking crime. The judge explained the verdict form. The verdict form had the correct language. The indictment had the correct language, and the jury appropriately found, based on the evidence, that Nobari and Zazueta possessed a firearm in furtherance of a drug trafficking crime, and the evidence supports the findings. The Pinkerton instruction, its government's position, it's not conceivable that Zazueta and Nobari were convicted of the 924C charge on the basis of co-conspirator liability. Any error in the instruction, therefore, was not prejudicial. With respect to the entrapment instruction, Defendant George clearly waived any objection to the charge because the entrapment instruction was a correct statement of the law, and U.S. v. Varela, case out of the circuit, 993F2nd, 686, deals specifically with the waiver of an entrapment instruction. I submit the Court should not consider the entrapment instruction issue. Assuming, arguendo, his entitlement to a specific unanimity instruction, Judge Gould, you considered the issue in Jazoby v. Allstate Insurance Company and specifically the Court there warned against over-instructing the jury and held that a general unanimity instruction is sufficient to instruct the jury that its verdict must be unanimous as to each element. Here the district court gave a unanimity instruction, and I agree that if the jury had any problem, there would have been a split, there would have been a hugged jury. Southwell, I don't think, applies the case that George relies upon because there is no jury confusion regarding the entrapment instruction in this case. I believe that the claims relating to entrapment and reasonableness of the sentence may be disposed of without extended oral argument. The record reveals that George was not entitled to raise an entrapment defense because he failed to establish absence of predisposition or inducement. There's no evidence of George's closely related claim of outrageous government conduct since there is an absence of evidence that government orchestrated the crime from the start to the finish. The reasonableness of George's sentence. Hey, your time has expired. If the number is going up, that means your deficit is down. Oh, I'm sorry, Your Honor. We trust that you will do the right thing, Your Honors, and hope that you affirm the convictions and the reasonableness of Mr. George's sentence. Thank you. Thank you. May I have some rebuttal on behalf of the defendants? All right. First, as to the ethnic statements. I think one of the reasons why the courts in this Court in Cabrera and the other courts that have addressed this issue are closer to structural error as a standard is because of the deliberateness. And not necessarily in this case to cast dispersions on various ethnic groups, but rather the more insidious method of associating a person's ethnicity with guilt and using that as evidence of guilt. And clearly the prosecutor here deliberately did that and doesn't think there's anything wrong with it. Counsel, is there any court that has actually stated that it's structural error? No. You described it as close to structural error, but you don't have to. That's right. We looked at you cited cases from the 2nd, 8th, D.C. circuits as well as our own. But no court has actually said it's structural error. No. Just in cases where there's absolutely tons of evidence against the people in every one of these cases, and yet the court finds plain error, it seems that they're applying a much more stringent standard against the government in this kind of situation. Because formal equality before the law is a bedrock of our legal system, and this court quoted the 8th circuit in VU stating that in another case where there's a lot of evidence against the person. And in this situation, the government also, worse than any of these other cases, directly linked in closing argument, the general expert testimony, the generalization, and said, these people, as you heard, their ethnicity, we didn't target them because of their ethnicity, but as you heard, it is significant that these people are Middle Eastern and that guy is Mexican because Middle Easterners are the middle men and Mexicans are the cooks. And so drawing that connection, the government thinks it's fine to do that, will continue to do that in further cases. And that's one of the roles, of course, of these types of decisions is to control that kind of behavior by the government. I want to address as to the gun count for Mr. Nobari. Yes, the gun is underneath the seat away from him. Nobody observed that there was a gun. But it is Mr. Nobari who's seated in the passenger seat, isn't it? When they're driving over there, he's seated in the passenger seat. No, when Agent Galvan gets into the car. Nobari's nowhere near the car. I'm sorry, it's not Mr. Nobari. It is Mr. George who's seated in the passenger seat. As they approach, Detective Galvan instructs George to get in the passenger seat, to get in the car and get in the passenger seat. It's not George who asserts that they should ever go back to the car or where he should sit. And he hesitates and he instructs him again to get in that seat. And so that is being controlled by the government agents in this case, not by the defendants. I'm sure they probably thought they would just stand in the parking lot and, you know, if there was going to be any kind of exchange that George was just going to hand him the money. That's what he thought. So as to, you know, this Mann and the Kraus case, those are insufficiency of the evidence cases. So the standard is very different in those cases than here. Here we're asking, could the jury have found a lower standard of participation based on these instructions? And, by the way, the government in her closing argument, the government also, mixed up and said the improper standard and said that it was during and in relation to. So she echoes the instruction and then the jury goes into the jury room and deliberates. And so the question is, could the jury have mixed, could the jury have followed that incorrect instruction based on the evidence here? Could they have found that Mr. Nobari possessed that gun during the felony but not in furtherance of it? And since they didn't feel they needed to, as instructed, they didn't have to have found that. So I want to just quote Cabrera again. The fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in order to obtain convictions. People cannot be tried on the basis of their ethnic backgrounds or national origin. And I would submit that's what happened here, Your Honors. Thank you very much. Thank you. We thank all counsel for your enlightening arguments. The case just argued is submitted and we'll move to the next case on the calendar.
judges: Gould, Clifton, Bybee